[No. 1748.]

HARRISON WASHINGTON *v.* THE STATE.

1. BURGLARY.— INDICTMENT for burglary with the intent to commit theft is not objectionable because it fails to specify the property which the defendant intended to steal.   A different rule prevails with respect to indictments for theft; and in them a description of the property stolen is essential to its identification.   But the statute defining burglary with intent to commit theft comprehends all the elements of that offense; and it is sufficient to allege them in the words of the statute.   See the opinion on the question.

2. SAME — PRACTICE — EVIDENCE.— A statement of the wife of a defendant on trial for a criminal offense, made to a witness, in the presence and with the acquiescence of the defendant, is purely hearsay evidence, and as such is, primarily, inadmissible against the defendant.

3. SAME — CROSS-EXAMINATION OF A WITNESS — IMPEACHING TESTIMONY — CASE STATED.— The wife of a defendant on trial, like any other witness, is subject to cross-examination, but a cross-examination should be confined to the matters about which the witness testified on the examination in chief.   The defendant's wife in this case, in her examination in chief, made no allusion whatever to meat.   On cross-examination she was asked by the State and denied that, in the absence of the defendant, she told the State's witness K. that there was no meat in the house.   The witness K. testified that, on the occasion referred to, she, the defendant's wife, in the absence of the defendant, told him that there was no meat on the place, and that she had cooked the last that morning for breakfast.   *Held*, that such evidence, under the circumstances, was inadmissible for any purpose, and, in view of the facts of the case, was prejudicial to the rights of the defendant.

4. SAME — CHARGE OF THE COURT.— Even had the evidence referred to been admissible for the purpose of affecting the credibility of the wife of the defendant as a witness in his behalf, the court should have instructed the jury that it must not be considered by them for any other purpose.

Appeal from the District Court of Rusk.   Tried below before the Hon. A. J. Booty.

The conviction in this case was for the burglary of the smoke house of Reuben Latham, in Rusk county, Texas, on the night of the 12th day of February, 1883, the intent of the defendant being alleged to be to steal the corporeal personal property of the said Latham, in the said house situate.   A term of two years in the penitentiary was the punishment assessed by the verdict.

Mrs. Sarah Latham, the wife of the prosecuting witness, Reuben Latham, was the first witness for the State.   She testified that, about 11 o'clock on Sunday, the day before the night of the burglary of the smoke house of the witness and her husband, the defendant came to their house and asked for Reuben Latham, whom, he said, he wanted to see about work.   She told the defendant that her husband was not at home, and told him to get down, hitch his mule and wait at the wood pile.   The defendant did so.   Reuben Latham not having returned at dinner time, the witness told the defendant to go to the kichen and get his dinner.   Defendant did so, and in going to dinner he made distinct foot-tracks in some sand that witness had spread over a wet place.   Defendant waited some little time after dinner for the witness's husband, who did not return, and defendant left, saying that he would come back again next day.   The witness's smoke house was a box structure, with four sides and cover.   When witness unlocked the smoke house door on Tuesday morning, she discovered that about four middlings of meat had been taken away.   The ground plank on the north side of the smoke house had been wrenched away, making an opening sufficiently large to admit the body of a man.   Witness also noticed grease on the planks at this opening, showing where the meat was taken out.   The smoke house had a soft dirt floor, on which the witness discovered a distinct shoe track, and the track of a small fice dog.   One of the shoe tracks, whether the right or left the witness did not remember, was somewhat turned over.   Witness did not take a measure of them, but carefully examined those in the smoke house and then the tracks in the sand, which she knew to have been made by the defendant, and which were still plainly visible, and she became positively satisfied that the several tracks in the sand and the smoke house were made by the same shoes. The tracks were about the size of a number eight or nine shoe, seemingly gaiters.   The tracks of the defendant in front of the kitchen door were made in deep sand, and were not turned over.   The

smoke house and meat were the property of Reuben Latham. The smoke house was locked at the time of the burglary, was situated in Rusk county, and was entered and the meat taken therefrom without the knowledge or consent of the witness.

Reuben Latham was the next witness for the State. He testified that he owned the smoke house entered, and the meat that was taken away; that the said house was entered and the meat, of the value of $15, taken without his knowledge or consent; that the entrance was made by wrenching the ground plank off the north side of the house, and that the meat was removed through the opening thus made. Witness saw the tracks of a man and a small dog on the floor of the smoke house, and the track of a man in the sand in front of the kitchen. The shoe tracks in the sand and in the smoke house appeared to be the same. The tracks in the sand were not run down at all, but one of them in the smoke house was, a little. The meat was taken out of the house through the hole made by displacing the plank, and was carried thence through a patch to where a mule was tied to a small black-jack tree. The tracks of the mule showed that the animal was shod in front. The witness and Lem Cooper followed the tracks of this mule from the black-jack tree to the house of the defendant, both coming and going. The mule tracks going to the black-jack tree, came direct from the defendant's house. Leaving the tree, they passed the defendant's house at a distance of some thirty yards, going to a branch on the Henderson road, when they turned back to the defendant's yard fence. Its tracks showed that the little dog followed the mule from and back to the defendant's house. Leaving the smoke house of the witness, the burglar traveled the Henderson and Overton road for two miles, and then took an old road. Witness and Cooper went to Henderson, got a search warrant, and Constable Knight, and went to the defendant's place, and found the meat in the defendant's crib, buried some four feet under corn and fodder. When the witness and Cooper left the defendant's house to go to Henderson for the officer and search warrant, the defendant's wife was at the house, and the defendant himself was in his field, near by. When they got back with the constable, the defendant's wife was still at the house, but the door of the house was locked. Constable Knight sent Cooper to the field for the defendant, and when he was brought up, the constable demanded the door key, which the defendant surrendered and the door was unlocked. The meat found in the defendant's crib belonged to the witness. He recognized it from the fact that the middlings were cut in halves, and the holes

by which it was hung up were cut in the belly side,— the witness's invariable practice in curing his meat. Defendant was brought to town. The meat was delivered to the witness by the justice of the peace, at the conclusion of the examining trial.

Lem Cooper testified, for the State, that on Tuesday morning following the night of the burglary, he, in company with Reuben Latham, followed the track of a number eight or nine shoe from the smoke house of the said Latham to a black-jack tree where a mule had been tied. The tracks were distinctly traceable through a patch traversed between the smoke house and the tree. Witness saw meat grease on the fence where the burglar got over. From here the tracks led to a black-jack tree where a mule had been tied. Near this point on the ground the witness found grease, showing, the witness thought, that the meat had been cut up at this point. The mule's track, and also that of a small dog, led from the defendant's house to the tree, and from the tree back to the defendant's house. Witness and Latham went from the defendant's house, where they left the defendant's wife, to town, and returned with Constable Knight and a search warrant. Reaching the defendant's house, Constable Knight sent witness to the field to arrest the defendant. He made no resistance to his arrest, or effort to escape. There was a little dog at the place where witness arrested defendant. This dog followed the witness and defendant to the defendant's house. Defendant gave Knight his crib key, and the meat was found in the crib, covered deep with corn and fodder. The party did not search the defendant's house for shoes similar to those that made the tracks described, nor did they examine a mule on the place.

Constable W. A. G. Knight next testified, for the State, to the effect that on Tuesday, the day after the alleged robbery, Latham and Cooper came to Henderson for him to assist in tracing the stolen meat. They procured a search warrant and repaired to the house of the defendant on the Reuben Olliver farm, about two miles west of the town of Henderson. They found the meat in the crib and brought it and the defendant to town, as detailed by the witnesses Latham and Cooper. Witness made no search of the defendant's premises for mule or shoes. The crib was locked when the witness and party reached the defendant's house, but when the defendant was brought to the house under arrest, the key was procured from him and the door unlocked. The meat was found buried some six feet under corn and fodder. Quite a number of negroes lived near the defendant on the Olliver farm. At this point the State rested.

Laura Washington, the wife of the defendant, was his first witness. She testified that on Monday night, the night of the alleged burglary, the defendant was not absent from his home. On the morning of that Monday, the defendant, Cato Cumby and Nat Austin went to town. The defendant not having returned at sundown, the witness went to the crib, milked and fed the cow, fed the mule, and returned to the house, leaving the key in the crib door. Within a short time the defendant arrived at home in company with Cumby and Austin. Witness told him that she had milked and fed; that their baby was sick and would require fire through the night, and that he would have to provide wood. Defendant procured the wood, and he and witness sat up throughout the night with the child, dozing, it may be, occasionally in their chairs. The defendant did not leave the house that night at any time, even to go to the crib. The key remained in the crib all night. The crib, as a usual thing, was kept locked, as it served as a smoke house and ware-room for provisions,— the residence house having but one room, which was occupied by defendant, witness and their three children.

This witness further testified that several families of negroes who worked the same farm lived within a few hundred yards of the house occupied by her and the defendant. The defendant owned no shoes other than those he wore at this trial. The constable and his party made no search for shoes on the premises, nor did they examine to see whether or not the defendant's mule was shod in front. That mule at that time was staked out in the field, and at that time was not shod either in front or behind. The witness did not deny, to Constable Knight, on Tuesday morning, that she had meat on her place. There was meat on the place, and that meat was obtained from Mr. Olliver, who furnished witness and defendant meat whenever they wanted any. Witness and defendant were then working for Olliver. The witness did not now remember whether the meat she had was ham, shoulder or middling, but thought it was middling. The defendant did not own a dog, but Billy Cumby, who lived near by, did own a small dog. This dog sometimes followed the defendant, but never stayed at the defendant's house. Defendant ate dinner at home on Sunday, the day before the alleged burglary, between 11 and 12 o'clock, and went off — the witness did not know where — after dinner.

R. W. Olliver testified, for the defense, that, at the time of the alleged burglary, the defendant lived on his, the witness's, place. He was a hard working man. Witness frequently let him have meat, the last time in June, 1882. He let the defendant have $10 in Octo-

ber, 1882. The defendant, at the time of the burglary, had a mule in his possession on which the witness held a mortgage. After the burglary witness let Nat Austin have this mule. The largest quantity of meat the witness ever furnished the defendant at one time was one middling. The defendant could have obtained meat from the witness at any time he would ask for it.

Nat Austin next testified, for the defense, that on Monday, the day of the night on which the burglary was alleged to have been committed, he, defendant and Cato Cumby left the town of Henderson together, to go home. This was late in the evening. Witness, defendant and Cumby lived near together on the Olliver farm. When they reached the defendant's house, a little after dark, they saw Laura, the wife of the defendant, who told the defendant that their child was sick and that he must procure some wood. The defendant took his ax and went towards the woods, and witness and Cumby went on home. On the next day the defendant's wife sent to the witness for oil for the sick child. The defendant had no smoke house, and used his crib to store meat in. Witness had frequently seen the defendant store meat in that crib, and had hauled meat to that crib for the defendant. Mr. Olliver let the witness have the mule used by defendant, on Wednesday, the day after the defendant's arrest. The mule was not then shod on a single foot, and all of his feet were grown out long. The defendant had no dog. He, defendant, wore a number eight shoe. Witness was often with the defendant, and if he, defendant, ever owned a gaiter or other fine shoe, the witness did not know it. This witness was corroborated in detail by Cato Cumby.

Cas. Blair, being introduced by the State in rebuttal, testified that he shod the fore feet of the defendant's mule about two years before this trial, but he could not remember whether he did so after or before Christmas, or whether in the winter or summer, or whether in the year 1882 or the year 1883.

Constable Knight, recalled by the State, testified that at the defendant's house, in the absence of the defendant, his wife Laura told him that there was no meat on the place, and that she had that morning cooked the last meat she had for breakfast. Defendant reserved exceptions to this evidence.

The questions considered in the opinion were the questions raised by the motion for new trial.

*Drury Field*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. I. It is not a valid objection to the indictment that it does not specify the property which it is alleged the defendant intended to steal. All the essential elements of theft are alleged in the words of the statute defining that offense, and this is all that is required in an indictment for burglary with the intent to commit theft. An indictment such as the one in this case was held sufficient in *Lawson* v. *The State*, 13 Texas Ct. App., 264. If the indictment had been for theft, it would have been required, for the purpose of identity, that the particular property stolen should be named and described in the manner prescribed by statute. (Code Crim. Proc., art. 427; *Williams* v. *The State*, 5 Texas Ct. App., 116.)

In holding the indictment in this case to be sufficient, we are not in conflict with the rule laid down in *Rodrigues* v. *The State*, 12 Texas Ct. App., 552, and the cases therein cited, which requires that an indictment for burglary must allege the particular felony intended to be committed, and describe the same by setting forth its statutory ingredients or essential elements. It is not a statutory ingredient or essential element of the offense of theft that the property stolen should be a particular kind of corporeal personal property. In a charge of theft it is only necessary to specify the property stolen for the purpose of identification, and not because the *description* of the property is an ingredient or element of the offense. It is an ingredient or element of theft that the property taken be corporeal personal property of some value, and if the indictment had failed to allege that the property intended to be stolen was of that character, it would have been a bad indictment; but there is no such omission in the indictment before us.

II. Defendant's wife testified in his behalf, and on cross-examination by State's counsel was asked if she had not told witness Knight, when he went to defendant's house in search of the meat, that there was no meat at the house. She answered that she did not make said statement. The State then proved by Knight that, on the occasion referred to, she told him there was no meat at the house; that she had cooked the last there was on the place that morning for breakfast. Defendant was not present when she made this statement to witness Knight. This testimony was admitted over the defendant's objections, and he saved a bill of exceptions thereto.

We think the court erred in admitting this evidence. It was certainly not competent evidence against the defendant, being hearsay. No statements made by her, when he was not present, and acquiescing therein, could be properly admitted against him. If admissible at all, it would only be for the purpose of affecting the credibility of

the witness, and this seems to have been the purpose for which it was admitted in this case. While it is true that she was subject to cross-examination like any other witness, it is also true that such cross-examination must be confined strictly to the matters about which she has testified on the examination in chief. (*Creamer* v. *The State*, 34 Texas, 173; *Greenwood* v. *The State*, 35 Texas, 587.)

On her examination in chief, she had made no statement whatever about meat, whether or not there was any at their house at the time named. If she had stated on her examination in chief that there was or was not meat at the house at that time, it would have been competent for the State to ask her, on cross-examination, if she had not made contradictory statements, laying the predicate in the proper manner, and upon her denying that she had made such statements, it would have been permissible for the State to prove that she had. (*Hampton* v. *The State*, 45 Texas, 154.) But having testified nothing about the meat, it was not proper to allow the State to ask her concerning it, even for the purpose of impeaching her testimony. It was indirectly causing her to testify against her husband, under cover of laying a predicate to impeach her testimony in regard to a matter about which she had not testified on her examination in chief.

In view of the facts of this case, this illegal evidence was of a material character, and calculated, in our opinion, to prejudice the rights of the defendant. The jury were not even cautioned by the court that they must confine their consideration of this evidence strictly to the purpose for which it was admitted, that is, for the purpose of affecting the credibility of the witness. Even had the evidence been admissible for this purpose, the court should have instructed the jury that it must not be considered by them for any other purpose.

Because the court erred in admitting said evidence, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered November 26, 1884.]